UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA

**MEMORANDUM & ORDER**
23-CR-00377 (JMA) (SIL)

-against-

MICHAIL MCKEN,

Defendant.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Defendant Michail McKen is charged with sex trafficking three victims, in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2) and (b)(1), and with the interstate prostitution of the same victims, in violation of 18 U.S.C. § Section 2422(a).  (See ECF No. 1.)  Presently before the Court is Defendant's motion to suppress certain evidence under Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h).  For the reasons set forth below, the motion is DENIED.

I. BACKGROUND

The Court issued an arrest warrant for Defendant on September 19, 2023, for the sex trafficking and interstate prostitution crimes described above.[1]  (See ECF No. 3.)

At approximately 8:00 AM on September 26, 2023, Defendant drove his car (the "Car") "one or two blocks" from his apartment in Phoenix, Arizona.  (Def.'s Aff., ECF No. 44-1 ¶¶ 3-4.) Law enforcement vehicles surrounded the Car when it was stopped at an intersection.  (Id. ¶ 4.) Law enforcement officers "yelled" at Defendant to exit the Car.  (Id. ¶ 5.)  Defendant declined to do so because he "was confused, nervous[,] and extremely scared."  (Id.)  Approximately one minute later, and following repeated instructions to exit the Car, law enforcement officers fired a non-lethal projectile through the Car's rear window.  (Id. ¶ 6; Aff. in Supp. of an Appl. Under Rule

---

[1] Unless otherwise noted, the facts set forth herein are undisputed for purposes of the instant motion.

41 for a Warrant to Search and Seize ("Warrant Aff."), ECF No. 46-3 ¶ 12.[2]) Defendant remained in the Car, despite repeated instructions to exit it, until law enforcement fired a second non-lethal projectile through the window on the Car's right-rear door and approached with a barking dog. (Def.'s Aff., ECF No. 44-1 ¶ 6; Warrant Aff., ECF No. 46-3 ¶ 12.) Defendant exited his car, was handcuffed, and was placed in the rear of a "county police car." (Def.'s Aff., ECF No. 44-1 ¶ 7.) "[A]n officer" drove the Car from the intersection to an area "behind a shopping center strip mall" that was a few "blocks away," (id.), to prevent the Car from blocking traffic. (Warrant Aff., ECF No. 46-3 ¶ 13.) Defendant "belie[ves]" law enforcement searched the Car when they moved it behind the shopping center. (Def.'s Aff., ECF No. 44-1 ¶ 7.) "The police vehicle in which [Defendant] was handcuffed followed to that location . . . ." (Id.)

Approximately one hour later, while still sitting in the rear of the police vehicle, Defendant asked two officers why he was arrested. (Id. ¶ 8.) The officers declined to answer that question. (Id.) Defendant asserts that the officers nonetheless "engaged [him] in conversation," which included them asking "some" unspecified questions to which Defendant gave unspecified answers. (Id.) According to the Government, the officers at that point merely asked Defendant for pedigree information. (Opp'n to Def.'s Mot. to Suppress ("Opp."), ECF No. 46 at 17.) Defendant insists that he was not "advis[ed] . . . of [his] rights"—but also admits he "really do[es] not remember" that initial conversation with the officers. (Def.'s Aff., ECF No. 44-1 ¶ 8.) The Government maintains that Defendant "was read his Miranda rights, which he acknowledged he understood." (Warrant Aff., ECF No. 46-3 ¶ 14.)

---

[2]  ECF No. 46-3 is Exhibit 1 to the Government's Opposition brief. That filing contains the search warrant for the Car, the application form for that warrant, and the affidavit in support of that application. For ease of reference, citations to that filing identify the relevant document along with pinpoint citations for the specific document.

2

Defendant again asked the officers why he was arrested. (Def.'s Aff., ECF No. 44-1 ¶ 10.) The officers stated they would not speak with Defendant about criminal conduct unless he signed a form "waiver of [Defendant's] rights." (Id.) The officers gave that form and a pen to Defendant. (Id.) The form bears the header "**ADVICE OF RIGHTS**" in large font and includes the following underneath the label "**YOUR RIGHTS**":

> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Opp. Ex. 3, ECF No. 46-2.) Defendant signed the bottom of the form underneath an acknowledgment that says "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Id.) Defendant insists he signed the form without reading it and that the officers neither orally advised Defendant of those rights nor read the form to him. (Def.'s Aff., ECF No. 44-1 ¶ 10.) After Defendant signed the form, the officers told Defendant that they arrested him for sex trafficking. (Id. ¶ 11.) The officers also "asked [Defendant] numerous questions to which [he] responded." (Id.) Defendant does not recount what answers he gave to those questions. According to the Government, Defendant admitted that he previously worked as a "pimp," confirmed two of his "street names," asked "which one of his girls gave him up," and admitted to owning firearms—though he denied having a firearm in the Car. (Warrant Aff., ECF No. 46-3 ¶ 14.)

3

During that discussion, Defendant declined to consent to a search of the Car. (Id.; Def.'s Aff., ECF No. 44-1 ¶ 8.) To secure the Car pending an application for a search warrant, the Federal Bureau of Investigation ("FBI") called a civilian towing company to bring the Car to an FBI office. (Warrant Aff., ECF No. 46-3 ¶ 15.) "FBI policy requires an inventory search to be conducted prior to the use of a civilian tow truck." (Id.) Accordingly, law enforcement conducted an inventory search of the Car. (Id.; see Def.'s Aff., ECF No. 44-1 ¶ 9 (reporting that Defendant observed a police officer inside the Car "opening compartments and taking pictures with a phone").) Law enforcement recovered a pistol and Defendant's cellphone.[3] (Def.'s Aff., ECF No. 44-1 ¶ 13; see Warrant Aff., ECF No. 46-3 ¶ 15; Opp Ex. 2, ECF No. 46-1.) The tow truck then transported the Car to an FBI office. (Def.'s Aff., ECF No. 44-1 ¶ 12.)

The next day, law enforcement obtained a search warrant for the Car. (Id.) No further items were seized in the resulting search of the Car. (Opp., ECF No. 46 at 6.)

## II.   DISCUSSION

Defendant filed a motion to suppress two categories of evidence: (1) the items recovered from Defendant's car, including his cellphone and the gun, and (2) any statements Defendant made in connection with his arrest. (Def.'s Mem. L. Supp. Mot. Suppress ("Def.'s Mem."), ECF No. 44-3.) The Government opposes that motion. (Opp., ECF No. 46.) Defendant did not submit a reply.

---

[3]   The Government insists that Defendant's cellphone was seized from his person upon arrest. (Opp., ECF No. 46 at 4, 12 n.7.) If that is true, the cellphone was properly seized as part of a search incident to Defendant's arrest. See Riley v. California, 573 U.S. 373, 388, 403 (2014); United States v. Smith, 967 F.3d 198, 209 (2d Cir. 2020). But the Government's contention makes no difference here. The cellphone's seizure was proper even if, as Defendant insists, it was recovered from the Car. Infra Section II.A.

4

**A.     Defendant's Car was Properly Searched**

Defendant insists that law enforcement violated the Fourth Amendment by searching the Car before obtaining the warrant to do so.[4]  (See Def.'s Mem., ECF No. 44-3 at 1-4.)  The Government responds that the search was valid under the automobile exception and as an inventory search.  (Opp., ECF No. 46 at 8.)  The Court agrees with the Government.[5]

**1.     The Automobile Exception Applies**

"[W]hile the Fourth Amendment generally requires police to obtain a warrant before conducting a search, an 'automobile exception' to this rule permits police 'to conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime.'"  United States v. Patterson, 25 F.4th 123, 150 (2d Cir. 2022) (quoting United States v. Gagnon, 373 F.3d 230, 235 (2d Cir. 2004)).  Defendant acknowledges that his car was readily mobile.  (See Def.'s Aff., ECF No. 44-1 ¶ 12 (criticizing law enforcement for towing the vehicle to the FBI office instead of driving it there)); see also United States v. Howard, 489 F.3d 484, 493-94 (2d Cir. 2007) (holding that a vehicle is readily mobile when it is merely "possib[le]" that it may be driven away, including by a person the police are not even aware of).  "Thus, the lawfulness of the car search" under the automobile exception "depends on whether it was supported by probable cause."  Patterson, 25 F.4th at 150.

---

[4]     Defendant's argument about his cellphone concerns its seizure.  (See Def. Mem., ECF No. 44-3 at 1-4.) Defendant does not challenge the later-issued search warrant for the cellphone or the resulting search of it.  (See Opp., ECF No. 46 at 12 (describing the search warrant issued on October 10, 2023).)

[5]     The Government also contends that the items recovered from Defendant's car would be admissible under the inevitable discovery doctrine.  (Opp., ECF No. 46 at 10-12.)  The Court declines to address that argument given the Court's conclusions that the search was valid under the automobile exception and as an inventory search.

"Probable cause 'is not a high bar.'" District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) (quoting Kaley v. United States, 571 U. S. 320, 338 (2014)). "It requires that 'the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched.'" Patterson, 25 F.4th at 150 (quoting United States v. Jones, 893 F.3d 66, 71 (2d Cir. 2018)) (ellipsis omitted). "The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found." United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). This analysis considers "the totality" of facts available to the officers. Patterson, 25 F.4th at 150 (citing United States v. McKenzie, 13 F.4th 223, 236 (2d Cir. 2021)); Howard, 489 F.3d at 492. "[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." Wesby, 583 U.S. at 61. "[T]he relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." Id. (quoting Gates, 462 U.S. at 243 n.13). Hence, "[p]robable cause can be established by a suspicious sound as it can be by a suspicious smell or appearance." United States v. Jackson, 652 F.2d 244, 251 n.6 (2d Cir. 1981) (citations omitted).

The Court concludes that, under the totality of the circumstances, law enforcement had probable cause to search the Car. The officers were authorized to arrest Defendant—based on a warrant—for sex trafficking and interstate prostitution. (ECF No. 3.) When the officers surrounded the Car and ordered Defendant to exit it, Defendant defiantly remained inside for over one minute until the officers shattered two windows and approached with a barking dog. See supra Part I. These circumstances gave law enforcement probable cause to believe Defendant refused to exit the Car because it contained evidence of criminality. See Patterson, 25 F.4th at 152

6

(concluding officers had probable cause to search a vehicle where its occupants matched descriptions of wanted assailants and they "did not immediately respond to police exit orders"); Wheeler v. Artola, 852 F. App'x 589, 592 (2d Cir. 2021) (holding officers had probable cause to search a vehicle where the driver was a known criminal who delayed pulling over and refused to comply with instructions to exit the car); United States v. White, 298 F. Supp. 3d 451, 460 (E.D.N.Y. 2018) (concluding officers, who smelled marijuana, had probable cause to search a vehicle where the driver refused to comply with directives to exit it); see also United States v. Martinez-Cortes, 566 F.3d 767, 771 (8th Cir. 2009) (holding that officers had probable cause to search a vehicle where they stopped it while executing a warrant and the vehicle's occupants "did not promptly comply with orders to put the vehicle in park and show their hands").

### 2. The Car was Properly Subjected to an Inventory Search

Even assuming it was not supported by probable cause, the search of the Car was still permissible as an inventory search. "The Supreme Court has long recognized that when police 'take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct.'"[6] United States v. Williams, 930 F.3d 44, 53 (2d Cir. 2019) (quoting United States v. Lopez, 547 F.3d 364, 369 (2d Cir. 2008)); see Illinois v. Lafayette, 462 U.S. 640, 643 (1983). "These 'inventory searches' are excepted from the probable cause and warrant requirements 'because they are conducted by the government as part of a community caretaking function' that police must perform separate and apart from their

---

[6] There is no dispute that the Car was properly taken into custody. Nor could there be. "When a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area." United States v. Perea, 986 F.2d 633, 643 (2d Cir. 1993) (internal quotation marks omitted). Consequently, law enforcement may impound a vehicle from a public location after arresting its occupants. See United States v. Lyle, 919 F.3d 716, 731-32 (2d Cir. 2019); United States v. Babilonia, 854 F.3d 163, 179 (2d Cir. 2017); Lopez, 547 F.3d at 366-67, 372.

responsibility to detect crime." Williams, 930 F.3d at 53-54 (quoting Colorado v. Bertine, 479 U.S. 367, 381 (1987)). Inventory searches protect the owner's property while it is in police custody, protect law enforcement against spurious claims of lost or stolen property, and protect law enforcement from potential danger. Id. at 54; Lopez, 547 F.3d at 369. Those objectives are "wholly independent of whether the contents of the car figure in any way in a criminal investigation or prosecution." Williams, 930 F.3d at 54 (quoting Lopez, 547 F.3d at 369-70).

An inventory search must be undertaken pursuant to a standard procedure. See Florida v. Wells, 495 U.S. 1, 4 (1990); Cady v. Dombrowski, 413 U.S. 433, 443 (1973). The procedure need not cover "every detail" of an inventory search. Lopez, 547 F.3d at 371. Instead, the procedure must "simply be adequate to 'safeguard the interests protected by the Fourth Amendment.'" Williams, 930 F.3d at 55 (quoting Lopez, 547 F.3d at 371). In other words, the procedure is valid so long as it does not afford officers "'so much latitude' as to whether, when, and how to search that inventory searches, in practice, become . . . 'a purposeful and general means of discovering evidence of crime.'" Id. (quoting Wells, 495 U.S. at 4). Proof of the requisite procedure may be established "by written rules and regulations or by testimony regarding the department's standard practices." Id. at 54 (citing United States v. Thompson, 29 F.3d 62, 65-66 (2d Cir. 1994)).

The Government has established that law enforcement conducted an inventory search of the Car under a standard procedure. The Government provided a sworn affidavit from an FBI Special Agent that confirms the Car was searched because "FBI policy requires an inventory search to be conducted prior [to] the use of a civilian tow truck." (Warrant Aff., ECF No. 46-3 ¶ 15.) Therefore, law enforcement validly conducted the inventory search after arresting Defendant and before allowing a third-party civilian to tow the Car to the FBI office. See Williams, 930 F.3d at 56-57; Lopez, 547 F.3d at 372; Thompson, 29 F.3d at 65-66.

Defendant insists that the inventory search was a ruse because it predated the search warrant issued the next day. (Def.'s Mem., ECF No. 44-3 at 3-4.) But an inventory search may predate an investigatory search. As explained above, the searches are "separate and apart" from each other due to their differing aims. Williams, 930 F.3d at 53-54 (explaining that inventory searches are motivated by "community caretaking" while investigatory searches aim "to detect crime" (quoting Bertine, 479 U.S. at 381)). To be sure, a routine inventory search to secure personal items from places like a glove box (where the gun was recovered) differs from a warrant-authorized search in which a vehicle may be dismantled to discover hidden evidence of criminality. See id. at 54-55 (holding that an officer who removed paneling to access a console merely conducted an inventory search because he did not use any "special tool," the paneling went "back into place," and the search did not damage the vehicle (internal quotation marks omitted)). At bottom, "nothing in the record suggests that the [FBI] inventory-search program at issue was but 'a ruse for a general rummaging in order to discover incriminating evidence.'" Id. at 57 (quoting Wells, 495 U.S. at 4).

Defendant also argues that law enforcement searched the Car by driving it from the street to the area behind the shopping center and that, as a result, law enforcement was precluded from again searching the car before it was towed. (See Def.'s Mem., ECF No. 44-3 at 3.) This argument fails twice over. Law enforcement did not search the vehicle by simply driving it. See Horton v. California, 496 U.S. 128, 134 (1990) (explaining that seizing property does not constitute searching it). And even if driving the Car somehow constituted a limited search, law enforcement was permitted to conduct an inventory search after they moved the Car. See Williams, 930 F.3d at 55. "Indeed, the need to ascertain that the inventory was complete and that all items in the car had been located was particularly acute in this case." Id. Because law enforcement was about to turn

9

Defendant's car over to a civilian tow truck, "'elemental reasons of safety' required that any dangerous instrument in the vehicle, such as the loaded weapon that they recovered, be located so as not to 'fall into untrained or perhaps malicious hands.'" Id. (quoting Cady, 413 U.S. at 443).

**B.      The Court Requires a Hearing on Defendant's Motion to Suppress his Statements**

Defendant asserts that law enforcement violated "the Fifth Amendment and the Due Process Clause" by (1) failing to warn Defendant, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), of the right against self-incrimination and (2) coercing Defendant into making incriminating statements. (See Def.'s Mem., ECF No. 44-3 at 4-6); see also Dickerson v. United States, 530 U.S. 428, 433 (2000) (explaining that the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment provide "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence"). The Government insists Defendant's statements to law enforcement are admissible. (See Opp., ECF No. 46 at 15-19.)

"A statement made by the accused 'during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement.'" United States v. Taylor, 745 F.3d 15, 23 (2d Cir. 2014) (quoting Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)) (brackets omitted). "In that context, 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." Id. (citing United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011)).

Relevant here are two types of statements not subject to Miranda protections. First, "[v]olunteered statements of any kind are not barred." United States v. Familetti, 878 F.3d 53, 58 (2d Cir. 2017) (quoting Miranda, 384 U.S. at 478). Thus, "[a] defendant's volunteered,

10

spontaneous statements are admissible notwithstanding the absence of Miranda warnings." United States v. Smalls, 719 F. App'x 83, 85 (2d Cir. 2018) (citing United States v. Compton, 428 F.2d 18, 22 (2d Cir. 1970)); see United States v. Figueroa, 822 F. App'x 7, 10 (2d Cir. 2020) (affirming denial of motion to suppress post-arrest statements because the defendant made them spontaneously and not "in response to police questioning"); see also Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980) (explaining that officers undertake "interrogation" under Miranda when they engage in "express questioning or its functional equivalent").  Second, statements made in response to "'pedigree' questions that pertain to administration or a defendant's basic identification information do not trigger Miranda."  Familetti, 878 F.3d at 57 (citing Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005)); see Smalls, 719 F. App'x at 85.

Where Miranda applies, the Court must "look at the totality of circumstances surrounding a Miranda waiver and any subsequent statements to determine knowledge and voluntariness." United States v. Mendonca, 88 F.4th 144, 164 (2d Cir. 2023) (quoting Taylor, 745 F.3d at 23). "Those circumstances generally fall into three categories: '(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" Id. (quoting United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018)).  "[T]he third category," i.e. coercive conduct by law enforcement, is "both a necessary and (potentially) sufficient condition to a finding of involuntariness."  Id. (first citing Colorado v. Connelly, 479 U.S. 157, 167 (1986); and then citing Haynes v. Washington, 373 U.S. 503, 504 n.1 (1963)).  The Government bears the burden to show, by a preponderance of the evidence, that the Defendant's waiver of the right against self-incrimination was "the product of free choice" and thus the statements are admissible.  United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (citing Connelly, 479 U.S. at 168-69; see United States v. O'Brien, 926 F.3d 57, 73 (2d Cir. 2019).

11

The Court cannot determine on the present record—consisting of the parties' contrary factual assertions—the extent to which <u>Miranda</u> applied and, where it did, whether Defendant knowingly and voluntarily waived his rights. The Government contends that Defendant made certain of his incriminating statements spontaneously when asked for pedigree information, namely, his name and date of birth. (Opp., ECF No. No. 46 at 17-18.) But the Government provided no evidence to support that assertion. The Government otherwise contends that Defendant made "similar" incriminating statements after officers orally read Defendant his <u>Miranda</u> rights, Defendant acknowledged those rights, and Defendant read and signed the written waiver form. (<u>Id.</u>; <u>see</u> Warrant Aff., ECF No. 46-3 ¶ 14.) But Defendant insists that he was not told about <u>Miranda</u> rights and that he did not read the waiver before signing it. (<u>See</u> Def.'s Aff., ECF No. 44-1 ¶¶ 8, 10.)

These disputed facts are critical in two respects. First, as explained above, Defendant's incriminating statements would not be subject to <u>Miranda</u> if they were made voluntarily during pedigree questioning. <u>See</u> <u>Familetti</u>, 878 F.3d at 57. Second, Defendant's attempt to suppress any statements made during his custodial interrogation turns on whether the Government can establish that a <u>Miranda</u> warning was given "and that it was understood by the accused" before his waiver. <u>Berghuis</u>, 560 U.S. at 384; <u>see</u> <u>O'Brien</u>, 926 F.3d at 73-74 (holding the defendant waived his <u>Miranda</u> rights because "he said he understood those rights when they were read to him," and, at that time, he was "alert, focused, and never evinced any difficulty understanding the agents or communicating with them"); <u>United States v. Spencer</u>, 995 F.2d 10, 12 (2d Cir. 1993) (concluding the defendant waived his <u>Miranda</u> rights, though he refused to sign an advice of rights form, because he admitted that "he read the form" and "understood all his rights" before questioning). To the extent the Government relies on Defendant's signature on the advice of rights form to make

12

that showing, the Government must demonstrate that Defendant "read[]" the advice of rights form or the rights "w[ere] read" to him. Taylor, 745 F.3d at 23; see Plugh, 648 F.3d at 127 (concluding that the defendant waived his Miranda rights where it was undisputed that he read the advice of rights form he signed); United States v. Montanez, No. 23-CR-186, 2024 WL 3360534, at *7-8 (E.D.N.Y. July 10, 2024) (concluding the defendant waived his Miranda rights where officers read those rights to him and he took approximately ninety seconds to review and sign an advice of rights form).

"A court must ordinarily hold 'an evidentiary hearing on a motion to suppress if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [Miranda waiver] are in question." United States v. Durand, 767 F. App'x 83, 87 (2d Cir. 2019) (quoting United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992)); see United States v. Getto, 729 F.3d 221, 226 n.6 (2d Cir. 2013); In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir. 2008). Consequently, "[a]n assertion [by a defendant] that Miranda warnings were not given, when the government asserts the contrary, . . . creates a specific factual dispute [that] cannot properly be resolved without an evidentiary hearing." United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998); see United States v. James, 415 F. Supp. 2d 132, 138 (E.D.N.Y. 2005) (explaining that the court held a hearing because the defendant "submitted an affidavit claiming that he was not advised of his rights"); cf. United States v. Whyte, No. 21-CR-00390, 2023 WL 8096926, at *9 (E.D.N.Y. Nov. 21, 2023) (refusing to hold a suppression hearing because the defendant "does not squarely attest that he was not—in fact—given Miranda warnings"); United States v. Walia, No. 14-CR-213, 2014 WL 2533848, at *2 (E.D.N.Y. June 5, 2014) (similar).

13

Based on the foregoing, the Court concludes that an evidentiary hearing is necessary on the facts pertinent to whether Defendant's post-arrest statements are subject to Miranda and, if so, whether Defendant waived his Miranda rights. The hearing will also address Defendant's related argument that his statements were not voluntarily made. See Dickerson, 530 U.S. at 444 (explaining that the validity of a Miranda waiver is a separate issue from the voluntariness of statements); Mendonca, 88 F.4th at 163 n.14 (same); Taylor, 745 F.3d at 23 (same).

### III. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's motion to suppress the evidence seized from the Car and RESERVES DECISION on Defendant's motion to suppress the statements he made in connection with his arrest. The Court will hold a hearing on the latter motion during the final pre-trial conference scheduled for October 23, 2024, at 10:30 AM.

The Court is issuing this Memorandum & Order under seal with copies to the parties because it cites Exhibit 1 to the Government's Opposition brief, (ECF No. 46-3), which is currently under seal. The Court intends to unseal this Memorandum & Order and Exhibit 1 to the Government's Opposition brief. The parties may file proposed redactions to those filings on or before October 22, 2024. If the parties do not timely submit proposed redactions, the Court will unseal both filings on the public docket.

**SO ORDERED.**

Dated:  October 16, 2024
        Central Islip, New York

                                              /s/ JMA
                                              JOAN M. AZRACK
                                              UNITED STATES DISTRICT JUDGE

14