UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA

                                                            **MEMORANDUM & ORDER**
                                                            23-CR-00377 (JMA) (SIL)

              -against-

MICHAIL MCKEN,

                         Defendant.
------------------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Before the Court is Defendant Michail McKen's motion to suppress incriminating statements he made to law enforcement when he was arrested in connection with this case. (See ECF No. 44.) Defendant asserts that law enforcement violated his constitutional rights by (1) failing to warn him, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), of the right against self-incrimination, and (2) coercing him into making the incriminating statements. (See Def.'s Mem. L. Supp. Mot. Suppress, ECF No. 44-3 at 4-6.) For the reasons set forth below, Defendant's motion is DENIED.

## I. BACKGROUND

      The Court presumes familiarity with the background of this case and sets forth only the facts pertinent to Defendant's motion.

      The parties' written submissions on Defendant's motion provided conflicting accounts of the circumstances in which Defendant made the relevant statements. (Compare Def.'s Aff., ECF No. 44-1 ¶¶ 8-11, with Opp'n to Def.'s Mot. to Suppress, ECF No. 46 at 17, and Aff. in Supp. of an Appl. Under Rule 41 for a Warrant to Search and Seize, ECF No. 46-3 ¶ 14.) As the Court previously explained,

> The Government contends that Defendant made certain of his incriminating statements spontaneously when asked for pedigree information, namely, his name and date of birth. But the Government provided no evidence to support that assertion. The Government otherwise contends that Defendant made "similar" incriminating statements after officers orally read Defendant his Miranda rights, Defendant acknowledged those rights, and Defendant read and signed the written waiver form. But Defendant insists that he was not told about Miranda rights and that he did not read the waiver before signing it.

(ECF No. 55 at 12 (citations omitted).) Consequently, the Court scheduled a hearing to resolve those factual disputes. (Id. at 13-14); see United States v. Mathurin, 148 F.3d 68, 69 (2d Cir. 1998); United States v. James, 415 F. Supp. 2d 132, 138 (E.D.N.Y. 2005).

## II.     FINDINGS OF FACT

The Court held the suppression hearing on October 23, 2024. (ECF No. 66.) The Government offered the testimony of two witnesses: Federal Bureau of Investigation ("FBI") Special Agent Daniel Johnson ("Agent Johnson") and FBI Special Agent Matthew Dean ("Agent Dean"). The Government also introduced video footage of Defendant's arrest and Defendant's signed advice of rights form. (Oct. 23, 2024, Hr'g Exs. 2-3.) Defendant did not offer any witnesses, did not testify on his own behalf, and did not introduce any exhibits. The Court finds that both witnesses were credible, and the Court credits their testimony in its entirety. Given that testimony, the Court concludes the affidavit Defendant submitted in support of his motion is not credible. The key aspects of the hearing testimony are highlighted in the below findings of fact.

### A.     **Defendant's Arrest**

On the morning of September 26, 2023, the Arizona Desert Hawk Violent Crime Task Force ("Task Force")—which included Agent Johnson, two other FBI agents, and five or six deputies from the Maricopa County Sheriff's Office—went to Defendant's Phoenix, Arizona address to execute the arrest warrant for Defendant issued in this case. (See Oct. 23, 2024, Hr'g Tr. ("Tr.") 9-12; see also Arrest Warrant, ECF No. 3.) The Task Force members were inside

2

unmarked vehicles outfitted with law enforcement lights. (Tr. 14.) The Task Force observed Defendant exit his apartment accompanied by an infant and a woman. (Tr. 14-15.) The Task Force refrained from arresting Defendant due to the presence of the child and the woman. (Tr. 15.) The Task Force observed Defendant get into his car alone and begin to drive. (Tr. 15.)

The Task Force followed Defendant "maybe a block and a half" before surrounding Defendant's car with their vehicles, activating the lights on their vehicles, and exiting their vehicles with guns drawn to positions of cover. (Tr. 16-18.) The Task Force members all wore vests with "law enforcement markings." (Tr. 13.) The Task Force ordered Defendant, over a public announcement system, to roll down his "heavily tinted" windows and exit his car. (Tr. 16-20.) Defendant "did nothing," so the Task Force fired bean bag projectiles into the rear windshield and the window on the rear-right door of Defendant's car to better see into it. (Tr. 20.) Those rounds did not "penetrate either window," so law enforcement remained unable to see into the car. (Tr. 21.) Defendant briefly rolled down the driver's window and placed his hands outside of it before withdrawing his hands and closing that window. (Tr. 22.) The Task Force removed a police dog from one of its vehicles and prepared to use the dog to arrest Defendant. (Tr. 22-23.)

Defendant then submitted to arrest without further incident at approximately 8:30 am. (Tr. 23-24, 75; see Hr'g Ex. 2 (depicting drone footage following Defendant leaving his apartment through and including his arrest).) Defendant was "quiet," "calm," and "resigned." (Tr. 24.) Defendant was not shaking, crying, yelling, or sweating. (Tr. 24.) Defendant did not appear ill. (Tr. 24.) In total, approximately three minutes passed from the time the Task Force surrounded Defendant's car and the time Defendant was placed under arrest. (Tr. 25.)

3

B. **Defendant's Statements**

The Task Force drove Defendant a short distance to a nearby staging area, where they re-handcuffed Defendant so that his hands were front of rather than behind him. (Tr. 26.) Agent Dean and Suffolk County Police Department Sergeant James Johnson ("Sergeant Johnson") were, at that time, partners in the Long Island Child Exploitation and Human Trafficking Task Force and were assigned to Defendant's case. (Tr. 53-54; see Tr. at 55-56 (explaining that Agent Dean and Sergeant Johnson worked as "subject matter experts" and were not physically involved with arresting Defendant).) Once they "were notified" of Defendant's arrest, Agent Dean and Sergeant Johnson traveled from a nearby location to the staging area, where Defendant remained in the rear of a law enforcement vehicle with his hands cuffed in front of him. (Tr. 55-57.)

When Agent Dean and Sergeant Johnson approached him, Defendant was sitting in the rear of a law enforcement pickup truck with the door open and his legs "swung outside the door." (Tr. 58.) Agent Dean and Sergeant Johnson stood in front of Defendant and allowed him to remain in that position. (Tr. 59.) Defendant had no physical injuries. (Tr. 59.) Agent Dean and Sergeant Johnson did not have their weapons drawn. (Tr. 59.) They initially asked Defendant pedigree questions, to confirm his name and date of birth, and to make sure Defendant was okay. (Tr. 59-60, 80, 84.) Defendant was "inquisitive" about "what was going on" and was "cool," "collected," and "calm." (Tr. 59.) Defendant "spontaneously uttered" that he believed he was arrested because he "used to pimp" in New York. (Tr. 60.)

Agent Dean decided to administer Miranda warnings and question Defendant at the staging area because that approach would obviate logistical travel issues. (See Tr. 61-62, 75-76 (explaining that the nearest FBI field office with an interview room was forty minutes in one direction and the detention center where Defendant had to be brought was "at least an hour in the opposite

4

direction").) Defendant remained in rear of the police vehicle with his legs out through the open rear door. (Tr. 62.) Agent Dean handed Defendant an Advice of Rights form and noted on the form that he did so at 9:07 am. (Tr. 63-64, 66, 81-82; Oct. 23, 2024, Hr'g Ex. 3.) The form bears the header "**ADVICE OF RIGHTS**" in large font and includes the following underneath the label "**YOUR RIGHTS**":

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Oct. 23, 2024, Hr'g Ex. 3.)

To make sure Defendant could read and understand English, Agent Dean asked Defendant to read the first line of the form out loud. (Tr. 63.) Defendant then read aloud "Before we ask you any questions, you must understand your rights." (Tr. 63-65.) Agent Dean then went "line by line" on the form and "specifically asked," after reading "each line," whether Defendant understood what it meant. (Tr. 63.) Defendant confirmed he understood each line. (Tr. 63.) Agent Dean "spen[t] a little more time" confirming Defendant's understanding of "the last line," i.e., that "[i]f you decide to answer questions now without a lawyer present, you have the right to stop answering at any time." (Tr. 65, 85; Oct. 23, 2024, Hr'g Ex. 3.) Agent Dean did that to make sure Defendant understood that he could end questioning at any time. (Tr. 65.) Agent Dean then asked

5

Defendant whether he wished to sign the form and waive his right to have counsel present for questioning; Defendant agreed and signed the form. (Tr. 65.) Defendant's signature appears below the following language: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Oct. 23, 2024, Hr'g Ex. 3.) Agent Dean and Sergeant Johnson signed the form to memorialize that they witnessed Defendant waive his Miranda rights and noted that Defendant signed the form at 9:08 am. (Tr. 66; Oct. 23, 2024, Hr'g Ex. 3.)

Agent Dean and Sergeant Johnson then informed Defendant that he was arrested in connection with sex trafficking. (Tr. 67.) Defendant remained "cool" and "collected," and there was "no reason to believe he was not of sound mind." (Tr. 67.) Defendant was focused, maintained eye contact, and was generally cooperative. (Tr. 67.) Defendant did not appear sick, confused, or unaware of what was happening. (Tr. 67-68.) Agent Dean and Sergeant Johnson inquired into Defendant's admitted history of pimping. Defendant stated, among other things, that he "pimped" from approximately 2014 to 2019, that he was arrested in Virginia for sex trafficking, that he previously sold "crack," and that he previously used the street names "Kels" and "Cavalli." (Tr. 68-69.) In this discussion, Defendant's demeanor was "conversational." (Tr. 72.) Defendant did not complain about his physical condition, indicate he was unwell, or ask for a lawyer. (Tr. 72.) The interview lasted approximately one hour, in which Defendant remained in the rear of the vehicle with his legs out its open rear door and with his hands cuffed in front of him. (Tr. 72.)

### III.   LEGAL STANDARD

"A statement made by the accused 'during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights when making the statement.'" United States v. Taylor, 745 F.3d 15, 23 (2d Cir.

6

2014) (quoting Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)) (brackets omitted). "In that context, 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." Id. (citing United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011)).

Statements made in response to "'pedigree' questions that pertain to administration or a defendant's basic identification information do not trigger Miranda." United States v. Familetti, 878 F.3d 53, 57 (2d Cir. 2017) (citing Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005)); see United States v. Smalls, 719 F. App'x 83, 85 (2d Cir. 2018); see also Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980) (explaining that officers undertake "interrogation" under Miranda when they engage in "express questioning or its functional equivalent").

Ultimately, the Government bears the burden to show, by a preponderance of the evidence, that the Defendant's waiver of the right against self-incrimination was "the product of free choice" and thus the statements are admissible. United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (citing Colorado v. Connelly, 479 U.S. 157, 168-69 (1986)); see United States v. O'Brien, 926 F.3d 57, 73 (2d Cir. 2019).

## IV.    CONCLUSIONS OF LAW

### A.    Defendant's First Statement is not Subject to Miranda

As noted above, Defendant "spontaneously uttered" during pedigree questioning that he believed he was arrested because he "used to pimp" in New York. (Tr. 60.) That statement is not subject to Miranda because Defendant uttered it in response to pedigree questioning. See Familetti, 878 F.3d at 57; Rosa, 396 F.3d at 221; Smalls, 719 F. App'x at 85.

7

**B.        Defendant's Miranda Waiver was Valid and His Statements Were Voluntary**

Where Miranda applies, the Court must "look at the totality of circumstances surrounding a Miranda waiver and any subsequent statements to determine knowledge and voluntariness." United States v. Mendonca, 88 F.4th 144, 164 (2d Cir. 2023) (quoting Taylor, 745 F.3d at 23). "Those circumstances generally fall into three categories: '(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" Id. (quoting United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018)). "[T]he third category," i.e. coercive conduct by law enforcement, is "both a necessary and (potentially) sufficient condition to a finding of involuntariness." Id. (first citing Connelly, 479 U.S. at 167; and then citing Haynes v. Washington, 373 U.S. 503, 504 n.1 (1963)).

Under those principles, Defendant knowingly and voluntarily waived his Miranda rights and made his inculpatory statements. The hearing testimony established that Agent Dean provided Defendant with ample Miranda warnings and the opportunity to review his waiver of rights, which was memorialized with Defendant's signature on the Advice of Rights form. See supra Section II.B. The testimony at the hearing also made clear that Defendant was not coerced into making inculpatory statements during his conversation with Agent Dean and Sergeant Johnson. See supra Section II.B. Further, Defendant offered no evidence at the hearing to refute the credible testimony presented by the Government. Based on these facts, the Court concludes that Defendant knowingly and voluntarily waived his Miranda rights and made his inculpatory statements. See O'Brien, 926 F.3d at 73-74 (holding the defendant waived his Miranda rights because "he said he understood those rights when they were read to him," and, at that time, he was "alert, focused, and never evinced any difficulty understanding the agents or communicating with them"); Plugh, 648 F.3d at 127 (concluding that the defendant waived his Miranda rights because he read the advice

8

of rights form he signed); United States v. Spencer, 995 F.2d 10, 12 (2d Cir. 1993) (concluding the defendant waived his Miranda rights because he admitted that "he read the form" and "understood all his rights" before questioning).

The fact that Defendant was in custody and had been arrested at gun point approximately thirty minutes earlier does not compel a contrary conclusion. The Second Circuit "ha[s] repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness." United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012) (collecting cases; addressing voluntariness of consenting to a search); see United States v. De La Cruz, No. 19-CR-00048, 2022 WL 88168, at *9 (D. Conn. Jan. 7, 2022) (rejecting defendant's argument that law enforcement breaking his door with a battering ram, entering his house in a tactical formation with guns drawn, and arresting him rendered his incriminating statements involuntary); see also United States v. Ramirez, 903 F. Supp. 587, 590-91 (S.D.N.Y. 1995) (rejecting argument that Miranda waiver was involuntary due to "being arrested at gunpoint by several agents, detained in a car, and handcuffed just minutes before he signed the form"). Furthermore, it makes no difference that Defendant was questioned in the rear of a law enforcement vehicle. See United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (holding that interrogation while handcuffed in the rear of a police vehicle following arrest did not render incriminating statements involuntary); United States v. Rivera, No. 17-CR-6094, 2018 WL 4502001, at *2–3 (W.D.N.Y. Sept. 19, 2018) (similar), report and recommendation adopted, 2018 WL 4952601 (W.D.N.Y. Oct. 12, 2018); United States v. Walia, No. 14-CR-213, 2014 WL 3563426, at *11 (E.D.N.Y. July 18, 2014) (holding that interrogation that began while the defendant was handcuffed in a police vehicle was not coercive).

9

## V. CONCLUSION

For the reasons stated above, the Court DENIES Defendant's motion to suppress the statements he made in connection with his arrest.

**SO ORDERED.**

Dated: October 24, 2024
       Central Islip, New York

                                              /s/ (JMA)
                                              JOAN M. AZRACK
                                              UNITED STATES DISTRICT JUDGE