UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
UNITED STATES OF AMERICA

                                          **MEMORANDUM & ORDER**
                                          2:23-cr-00377 (JMA) (SIL)

      -against-                                                            FILED
                                                                             CLERK

MICHAIL MCKEN,
                                                        5/13/2025 12:27 pm

                                                     U.S. DISTRICT COURT
                          Defendant.                     EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X    LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

After a six-day trial, a jury convicted Defendant Michail McKen ("McKen") of two counts of Sex Trafficking and two counts of Interstate Prostitution. Presently before the Court is McKen's motion for acquittal under Federal Rule of Criminal Procedure ("Rule") 29 or for a new trial under Rule 33. (ECF No. 116.) For the reasons set forth below, the motion is DENIED.

## I.     BACKGROUND

### A. The Charges

On September 19, 2023, a grand jury charged McKen with six counts in an Indictment. (ECF No. 1.) Counts I, III and V charged McKen with Sex Trafficking, in violation of 18 U.S.C. § 1591(a)(1), and Counts II, IV and VI charged McKen with Interstate Prostitution in violation of 18 U.S.C. § 2242(a). (Id.) Counts I and II pertained to conduct involving Charity (identified in the Indictment as Jane Doe #1) from April 2019 to December 2019; Counts III and IV pertained to conduct involving Amanda (identified in the Indictment as Jane Doe #2) from September 2019 to October 2019; and Counts V and VI pertained to conduct involving Ella (identified in the Indictment as Jane Doe #3) from July 2019 and January 2022. (Id.)

### B. The Trial

Trial commenced on November 4, 2024, and concluded on November 12, 2024, with a jury verdict that found McKen guilty on Counts III-VI of the Indictment. (See ECF Nos. 94, 105.) The

jury could not reach a unanimous verdict on Counts I and II, and as a result, a mistrial was declared as to Counts I and II of the indictment. (Id.) The following facts were established at trial.[1]

### 1. Offense Conduct Regarding Amanda[2]

Amanda first met McKen in September of 2019, when they came in contact via the website Plenty of Fish. (Tr. 599-601.) At that time, Amanda was homeless and battling a drug addiction. (Tr. 598-99.) Amanda was in treatment at a methadone clinic and was attending Narcotics Anonymous. (Tr. 598-99.) She was staying at a Motel 6 in Portsmouth, Virginia, and working as a prostitute, although she testified at trial that on the day she met McKen, she did not "have enough money to pay the rent for the following day." (Tr. 588.) After speaking on Plenty of Fish, McKen wanted to "set up a date." (Tr. 603.) Amanda understood that the "date" would include him paying for her hotel room in exchange for sex. (Tr. 644.) He met Amanda in a parking lot, and asked her to drive with him to Richmond, Virginia, along with his passenger – Charity. (Tr. 601-02.) Even though she had a methadone treatment the next morning, Amanda entered McKen's vehicle after he "told [her] to get into the effing car as he was putting [her] things into his vehicle." (Tr. 603.) Amanda handed over her identification, the contents of her wallet, and her last $57 to Charity. (Tr. 604.)

McKen then brought Amanda to a Red Roof Inn and made her have sex with him. (Tr. 607.) Amanda testified that she "did not want to, but [] he wanted to try the product out." (Tr. 610.) Subsequently, it became apparent to Amanda that she would have to perform sex acts at McKen's discretion, and that he would control the money she earned. (See Tr. 609-10 ("basically

---

[1]   The Court focuses on the facts established as to Amanda and Ella, given that McKen was only convicted on Counts III through VI, and those Counts are the subject of the instant motion.

[2]   Relevant facts are taken from the Trial Transcript ("Tr.") (ECF Nos. 97,98,99,100,101).

2

any dime that I got was to be handed over to him. And I if I got caught with money I was told that it would not be good, not to steal from him. I better give him every single dime.")) McKen indicated that he would use the money she earned to buy her drugs. (Tr. 604-605.) Amanda further testified that McKen strip searched her on one occasion "to make sure [she] had no money on [her]." (Tr. 618.)

During her time with McKen, Amanda "wasn't allowed to hold on to [her own drugs]. They were completely in his control. So it was basically he would give it to [her] and he would give [her] how much when he felt like it." (Tr. 606.) McKen often withheld drugs from Amanda, frequently leading to severe withdrawals. (See Tr. 607 ("it was to the point where there was times where I was literally crying and begging him . . . the withdrawals from the Methadone were getting really, really, really bad.")) Amanda testified that McKen withheld drugs from her to force her to work: "I think it was if you work more, you know, if you make me more money . . . I'll take better care of you." (Tr. 624.)

During this time, Amanda was performing numerous commercial sex acts, to the point where "[she] was only getting catnaps. Like [she] would fall asleep for 20 minutes and then it would be, there's a date coming up; get up." (Tr. 614.) Amanda also stated that she was not comfortable with the sex acts McKen requested she perform: "I never had anal sex before, but I was told that somebody wanted anal sex for a certain amount of money. So I had to do it." (Tr. 615.) Furthermore, Amanda gave testimony that she:

> was also instructed that at no time was [she] allowed to look up. Everywhere [she] walked [she] had to look at the ground and he also explained that we were in an area that he knew a lot of people in and that he had told people that [she] was with him and that if [she] looked at anybody in the face or if [she] spoke to anybody, that they would let [McKen] know.

(Tr. 607-608). McKen also controlled when and what Amanda ate. (Tr. 612) ("pretty much what

3

I was being fed was he would get me, like and I it's a Michelin's and I know because I hate them now. I hate them. It's this little, like, fried rice or little Alfredo but it's a little dollar thing that you get at the Dollar Tree and I got, like, one or two of those a day.")

In October 2019, toward the end of her time with McKen, Amanda traveled to Long Island, New York to continue working. (Tr. 624-25.) At this time, she developed a bladder infection and went to the hospital. (Tr. 625.) After being treated, she returned to McKen and Charity because she "didn't know what else to do. And [she] knew that he knew where [she] was going because [she] had to tell him where [she] was going." (Tr. 625). Upon her return, she continued to prostitute herself at McKen's direction. According to her testimony, McKen "yelled at [her] and he said, you might be addicted to opiates but I'm addicted to money . . . you need to make me more money. And [she] said, you are the one in charge of that part. . . I'm here at your beck and call." (Tr. 626.) Eventually, after several fights, McKen dropped Amanda at the side of the road to buy drugs. (See Tr. 627 ("I think he gave me 40 bucks or 60 bucks and I couldn't take it anymore. I left. I was done.")) Amanda testified that although she was working "independently" as a prostitute before she met McKen, when she was with him, she "wasn't choosing to do what [she] was doing." (Tr. 618). She "had nowhere to go and doing it with him was different because it just – it would go on, and on, and on." (Tr. 619).

Charity corroborated Amanda's account. She testified that McKen picked Amanda up in Virginia and subsequently had her engage in prostitution in several different states. (See Tr. 333-34.) Furthermore, Charity explained that McKen had Amanda perform unsafe acts—including sex without a condom—because it was "way more money" for him. (Tr. 335). Additionally, Charity testified to Amanda's drug addiction and McKen's control over her drugs. (See Tr. 331 (describing a situation where Charity and McKen "were sitting in a car while Amanda was given money to go

4

up [to] this area called Methadone Alley in Boston . . . and she was looking for drugs. We gave her money to go get drugs.")) Charity further confirmed that, based on her own observations, "the defendant wanted to maintain the perfect level of drugs to keep [Amanda] working at capacity." (Tr. 307).

### 2. Offense Conduct Regarding Ella

In October of 2019, Ella met McKen in Chester, Virginia after he responded to her advertisement on a website called skipthegames.com. (Tr. 45-47.) Ella had just turned 18. (Tr. 47.) She had been engaged in prostitution prior to meeting McKen. (Tr. 44.) After McKen reached out, Ella met up with him at a motel, where she learned he was a pimp. (Tr. 49.) During this meeting, McKen explained that Ella could work for him by doing sex dates, and "explained to [her] that [she] needed to give him all [her] money in order for him to elevate [her] life." (Tr. 49.) Ella had sex with McKen during this meeting, and was in debt to him due to the "choose up fee" he imposed on her. (Tr. 50-51.) She gave him the $1,000 she had and owed him $1,000 more, "payment [that] basically sa[id she was] serious to be with him." (Tr. 51; see also Tr. 193). She also tattooed his nickname—Cavalli—in large letters right across her rib cage. (Tr. 174.) She did so to show "loyalty towards him and [her] working for him, [her] being his female at the time." (Tr. 174.)

During her time with McKen, Ella was instructed to "always keep [her] head down, float through the room like a butterfly, just go very unseen." (Tr. 58.) She could not go "out of pocket," meaning she had to agree to follow the rules and always stay loyal to the defendant. (Tr. 58.) Ella testified that "those rules made [her] scared to break them . . . [She] was scared to see the outcome if [she] didn't follow the rules." (Tr. 59.) Ella further stated that she was afraid to be disloyal and feared "Cavalli coming to find [her]." (Tr. 140.) When she was not physically with McKen, she

5

was in constant communication about "everything [she] did. If [she] was seeing a date, [she] would have to communicate that. If [she] was leaving the hotel, [she would] have to communicate that. He would keep up on any activity through the day." (Tr. 97.) Even when she went to other states to perform prostitution, Ella continued to give McKen all her money, "because that's what he told [her she] had to do." (Tr. 61.) If clients gave her tips, she gave the tip money to McKen, "because he required [her] to give him all of [her] money. That counts as all of it . . . any dollar [she made], it had to be handed over." (Tr. 93.)

During their time together, McKen took Ella to Arizona, where they lived in a home rented in her name, funded by money she made from prostitution. (Tr. 127-128.) During this period, "[they] really started arguing with each other." (Tr. 133.) Ella recalled an incident where they were building a bed together when McKen "got mad" and "ended up hitting [her]." (Tr. 133.) Ella testified that the violence became more frequent from then on: "whether it was hitting me in my face, choking me, slamming me to the ground, it was consistent throughout the two years I was with him." (Tr. 134.) As Ella understood it, "99 percent of the time it's because he felt like [she] was being rude to him." (Tr. 136.)

McKen also threatened Ella with firearms. (See Tr. 136.) While looking at photos of the house they lived in, Ella pointed to the kitchen and explained that "Cavalli had held a gun to [her] head in this kitchen." (Tr. 136.) She testified that during this fight, she "told him [she] was going to leave him and he told [her] if [she] ever left him, he would kill [her]." (Tr. 137.) On another occasion, McKen pointed a gun at Ella in the driveway of the Arizona house. (See Tr. 168 ("Cavalli had walked out of the house with a gun and I went inside with him and he pointed this gun at me and we kind of wrestled around for a little bit.")) Ella testified that the defendant "had two handguns that remained in the house at that time," that he would keep "mainly wherever he

6

was." (Tr. 138.) Ella further stated that when McKen pointed the gun at her that she "felt scared. [she] felt scared that he was going to accidently pull the trigger." (Tr. 138.)

In October 2020, Ella left Arizona and traveled home to be with her family. (Tr. 145.) Around this time, she learned she was pregnant. (Tr. 146.) When Ella told McKen about the pregnancy, he "said that [she] was going to have an abortion." (Tr. 146.) She flew back to Arizona so that McKen would pay for the abortion. (Tr. 146-47.) Shortly after Ella took the abortion pill, McKen became upset that she did not "do the laundry and he proceeded to choke [her] and hit [her] while [she] was in bed going through the abortion." (Tr. 147.) Within two weeks, McKen "made it known that [she] needed to get back on the road" to perform sex work for him. (Tr. 147-48.) Ella did so. (Tr. 148.)

Ella again left McKen from approximately April to September 2021, came back, and "officially left him later that year, around New Years Eve 2022." (Tr. 64.) Due to her financial struggles, she returned in September 2021 to McKen in Arizona. (Tr. 166 (Ella testifying that she felt "[s]tressed out because I had nothing and just given him all my money for that rent. I couldn't even afford a hotel at that time. I was sleeping in my car.")) After one argument, McKen approached her with a gun in the driveway, and threatened that he would "kill [her] family" and showed her screenshots of her credit report, with prior addresses, evidencing his knowledge of their whereabouts. (Tr. 171-172.) She left shortly thereafter. (Tr. 172.) In the aftermath, McKen "immediately stopped paying all bills toward [the] home and [she] ended up getting an eviction," which appeared on her credit record at the time of her testimony. (Tr. 173.)

### 3. McKen's Uncharged Firearms' Possession

Additionally, the Government introduced three separate incidences of McKen's possession of firearms. Virginia State Trooper Eric Todd testified about a 2015 traffic stop in Virginia, where

7

he recovered a firearm from a holster in McKen's waistband. (Tr. 442-52.) Next, FBI Special Agent Daniel Johnson testified about McKen's 2023 federal arrest in Arizona, where Johnson recovered "a hand gun in the glove box on the passenger side" of McKen's vehicle. (Tr. 463.) The jury was shown photos of the firearm. (ECF No. 91, Ex. 1001.) Finally, the Government introduced a gun recovered from McKen in Arizona on February 19, 2023, several months before his federal arrest in 2023 through a stipulation. (Tr. 450-51; ECF No. 91, Ex. 1101).

## II. LEGAL STANDARDS

### A. Rule 29

Rule 29 provides that after the close of the government's evidence in a criminal trial, and on the defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). As explained below, "[a] defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).

"Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal." United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)), cert. denied sub nom. Bowers v. United States, 142 S. Ct. 1396 (2022). The Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (quoting Martoma, 894 F.3d at 72); see United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (similar). "As long as the evidence 'would suffice to convince any rational trier of fact

8

that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand.'" Jabar, 19 F.4th at 76 (quoting United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994)); see White, 7 F.4th at 98 (similar). The evidence must be evaluated "in conjunction" rather than by "piecemeal or in isolation." United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019); see also Guadagna, 183 F.3d at 130 (noting that "each fact may gain color from others").

In that analysis, "the court must be careful not to usurp the role of the jury." Jabar, 19 F.4th at 76. "'Rule 29 does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury.' Thus, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'" Id. (quoting Guadagna, 183 F.3d at 129) (internal alterations omitted).

### B. Rule 33

Under Rule 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Rule 33 motions are 'granted only in extraordinary circumstances, and are committed to the trial court's discretion.'" United States v. Escalera, 957 F.3d 122, 137 (2d Cir. 2020) (quoting United States v. Torres, 128 F.3d 38, 48 (2d Cir. 1997)); see United States v. Landesman, 17 F.4th 298, 330 (2d Cir. 2021) (similar). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) (quoting United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013)); see United States v. McPartland, 81 F.4th 101, 123 (2d Cir. 2023) (similar). In doing so, the Court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly

9

usurping the role of the jury." United States v. Peters, 843 F. App'x 369, 374 (2d Cir. 2021) (quoting United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001)) (internal alterations omitted). For that reason, "[a] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." Landesman, 17 F.4th at 330 (quoting United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020)). Ultimately, under Rule 33, "'[t]he defendant bears the burden of proving that he is entitled to a new trial,' and in order to grant a new trial, 'a district court must find that there is a real concern that an innocent person may have been convicted.'" United States v. Hunter, 32 F.4th 22, 30 (2d Cir. 2022) (quoting United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009)); see McPartland, 81 F.4th at 123 (similar).

### III.    DISCUSSION

McKen advances two arguments for acquittal under Rule 29 or, alternatively, for a new trial under Rule 33. (See generally, ECF No. 116.) The Government opposes both grounds for acquittal and a new trial. (See generally, ECF No. 118.) McKen's arguments are addressed in turn.

#### A. The Uncharged Firearms' Evidence Was Relevant and Admissible

McKen first argues that the admission of the three incidents of uncharged firearms' possession was improper. He asserts that: (1) the admission of this evidence was not relevant to prove coercion, an element of the charged crimes; (2) it was impermissible "other acts" evidence under Federal Rule of Evidence 404(b); and (3) its probative value was outweighed by the risk of unfair prejudice under Rule 403. (See ECF No. 116 ("Def.'s Br.") at 2-8). McKen contends that the admission of this evidence during trial "resulted in the deprivation of a fair trial and improperly bolstered an otherwise insufficient amount of evidence as to an element of the charge." (ECF No.

10

120 ("Def's Reply") at 1.) For the following reasons, the Court rejects McKen's argument with respect to the firearms evidence.

### 1. The Firearms Evidence is Relevant

"Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" United States v. Herbin, 367 F. App'x 208, 209 (2d Cir. 2010) (quoting Fed. R. Evid. 401.) The relevance of the uncharged firearms possession was the subject of substantial in limine motion practice prior to trial. (See ECF No. 50 at 22-23 (Government's in limine motion seeking to admit evidence of McKen's uncharged firearms possession); ECF No. 52 at 2 (Defendant's opposition to admission of the firearms evidence.)) On October 23, 2024, the Court granted the Government's motion in limine over Defendant's objections and allowed the firearms evidence to be admitted because "[t]his evidence goes directly to a possible coercive scheme that the defendant used to accomplish a key element of the charged offenses." (ECF No. 109 at 91.)

McKen reiterates his arguments against the relevance of the firearms possession. Specifically, McKen takes issue with this Court's application of United States v. Wilkins, 538 F. Supp. 3d 49, 74 (D.D.C. 2021). This Court relied on Wilkins for the proposition that McKen's prior firearms possession was admissible because:

> The Government must prove at trial that [Defendant] used force, fraud or coercion to cause the three complainants to engage in commercial sex acts and, as previously detailed, coercion includes "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2). Firearms are potentially deadly weapons. Evidence regarding [Defendant's] access to guns, therefore, goes directly to a possible coercive scheme he used to accomplish a key element of the charged offenses.

Wilkins, 538 F. Supp. 3d 49 at 74. McKen, however, contends that this Court misinterprets Wilkins. As McKen points out, "[t]he Wilkins court continued by stating that 'indeed, such a culture of fear and coercion can be created even in the absence of defendant's abuse of a specific victim, <u>when the victim is made aware of the defendant's history</u> of physical or sexual violence against others.'" (Def's Br. at 3) (quoting Wilkins, 538 F. Supp. 3d 49 at 72) (emphasis added by Defendant.) McKen argues this language supports his proposition that "for the firearm evidence introduced in the instant case to be relevant to the element of coercion with respect to the counts relating to the complainants Amanda and Ella, those women would have had to be aware of his use of those particular firearms." (Id.) Because the trial record contains no evidence that Amanda and Ella had knowledge of these particular firearms, the evidence pertaining to them is not relevant, as there is no "sufficient factual nexus between these three firearms and any of the complainants . . ." (Id. at 3-5.)

The Court disagrees with this conclusion and finds that the firearms evidence is relevant. Initially, the language cited by McKen does not stand for the proposition that Amanda and Ella must have known about the specific firearms in question for their past possession to be relevant. As the court in Wilkins makes clear, "evidence of Mr. Wilkins's access to firearms constitutes a source of his potential coercion over the complainants." Wilkins, 538 F. Supp. 3d 49 at 74. Defendant's general "access to firearms" was considered relevant to the issue of whether there was a "possible coercive scheme he used to accomplish a key element of the charged offenses." Id. This proposition applies here, as Ella gave extensive testimony that McKen threatened her with guns on multiple occasions. (See, e.g., Tr. 137-40; 168-170.) As this Court explained at trial regarding a similar argument from McKen:

> I think the nexus is that he displayed guns to the two witnesses who testified so far. As the Government points out, the conversations with his statements about 2015,

12

and his having been a pimp at that time is the time when he was arrested for possessing a gun. So it's all consistent behavior, you know, his being a pimp according to the witnesses who have testified, involved coercion and one of his methods of coercing these women was to display guns at various times, at least according to their testimony. So I don't think it's too remote, and I don't think it's too attenuated, and I'm going to admit it. So I'm not changing my mind.

(Tr. 438.) The Court does not see any reason to abandon its reasoning now.

Additionally, the Wilkins Court cites United States v. Lewis, 762 F. App'x 786, 798 (11th Cir.), cert. granted, judgment vacated on other grounds, 140 S. Ct. 613, 205 L. Ed. 2d 380 (2019), which affirmed a district court's admission of an undated photograph of defendant holding a firearm, as it "tended to corroborate [complainant's] testimony that she was coerced into engaging in prostitution due to the defendant's habitual use of firearms." 762 F. App'x 786 at 798. Lewis is apt here, as the Eleventh Circuit upheld the admissibility of the undated photo even though the victim "did not testify that (1) [Defendant] used the depicted firearm in committing a charged offense, (2) she was present when the photograph was taken, or (3) she knew when or in what context the photograph was taken." Id. The Eleventh Circuit concluded "that these arguments go only to how much probative value the photograph had, not whether it had any relevance at all." Id. The firearms evidence here has probative value for the same reasons. Thus, the Court once again finds that McKen's previous possession of firearms is relevant to prove Mcken's coercive scheme.

### 2. The Firearms Evidence Is Permissible Other Acts Evidence

McKen next contends that the firearms evidence is impermissible propensity evidence pursuant to Rule 404(b). Essentially, McKen reiterates his argument that there was a "completely speculative nexus between any of the three firearms and the conduct, alleged to be coercive in the indictment." (Def's Br. at 6-7.) McKen concludes that "the firearm evidence was, in truth, offered for proscribed purposes, specifically bad character and propensity…" and its admission into

13

evidence "tainted the entire proceeding and resulted in Mr. McKen receiving an unfair trial." (Def's Reply at 2.)

Pursuant to Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID 404(b)(1). Other acts evidence, however, is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID 404(b)(2). "Under this Circuit's 'inclusionary approach' to Rule 404(b), evidence of prior acts 'is admissible for any purpose other than to show a defendant's criminal propensity.'" United States v. Moye, 793 F. App'x 19, 21 (2d Cir. 2019) (quoting United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)).

As stated above, there is a clear nexus between McKen's uncharged firearm possession and the coercive element of his conduct, given the extensive testimony at trial regarding his use of guns to threaten Ella. Moreover, the firearms evidence was admitted for the purpose of proving McKen's coercive plan, as the Government argued at trial:

> the guns were a tool of his trade. They were a part of the business plan. They were used to intimidate, to illustrate just how serious his threats were and to keep Ella working, to keep her doing exactly what he wanted, which was having sex with men to make money for him.

(Tr. 669.) This evidence then, was not improperly admitted to prove McKen's mere propensity to carry weapons. Rather, the uncharged firearms' possession was advanced to demonstrate McKen's ready access to and facility with firearms in the context of his overall plan of coercing his victims to engage in prostitution. See United States v. O'Connor, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude of particular situations, which do not fall into simple categories.") Thus, the Court finds that the firearms evidence was permissible other acts evidence under Rule 404(b).

14

### 3. The Probative Value of the Firearms Evidence Was Not Substantially Outweighed by A Risk of Unfair Prejudice

Finally, McKen argues that even if the firearms evidence was relevant, it still should have been precluded because its probative value was substantially outweighed by its risk of unfair prejudice. (Def's Br. at 8-10.) Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." FED. R. EVID. 403. The core of McKen's argument is that gun possession is "a hot-button issue of nationwide concern . . . and therefore cumulative evidence about such possession over time . . . likely diverted the jury's attention from material issues of the trial." (Def's Br. at 9) (citing United States v. Wright, 993 F.3d 1054, 1061 (8th Cir. 2021.)) Moreover, McKen contends that there was "other alternative evidence relating to allegations of Mr. McKen's possession of firearms, specifically Ella's testimony, upon which the jury could determine coercion," and thus the firearms evidence at issue was "unfairly prejudicial." (Id. at 10.); see Old Chief v. United States, 519 U.S. 172, 182–83, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (holding that the court may consider whether an alternative piece of evidence was available that may carry "substantially the same or greater probative value but a lower degree of unfair prejudice" in the context of Rule 403.)

The Court rejects McKen's argument and finds that the probative value of the firearms evidence was not substantially outweighed by a risk of unfair prejudice. As discussed above, the evidence of prior possession of firearms was relevant to McKen's plan to coerce the victims to continue working for him. Again, this evidence is highly probative given Ella's testimony that McKen had "pointed this gun at [her]" on several occasions. (Tr. 168.) Furthermore, the firearms evidence presented a low risk of unfair prejudice. The risk of "other-crime evidence" is that it "can lead a jury to convict a defendant because of his participation in the other crimes rather than

15

because he is guilty beyond a reasonable doubt of the crime alleged." United States v. Garnes, 102 F.4th 628, 640–41 (2d Cir. 2024) (internal quotations and citation omitted.) Here, however, the risk of prejudice is low, given that the jury already heard Ella testify to McKen's gun possession and threats over several years. The sanitized evidence regarding McKen's previous gun possession did not pose a serious risk of unfair prejudice within this context. Finally, although McKen asserts that Ella's testimony alone was sufficient for the jury to determine coercion, the Court holds that the previous firearms possession evidence was crucial to "corroborate the details of the victims' testimony—testimony that the defense claimed was not credible." United States v. Carson, 870 F.3d 584, 600 (7th Cir. 2017). Thus, the Court finds that the probative value of the firearms evidence was not substantially outweighed by a risk of unfair prejudice.

The Court therefore rejects McKen's arguments that the uncharged firearms possession should not have been admitted into evidence. Because the evidence was properly admitted, the Court does not find that McKen is entitled to acquittal or a new trial pursuant to Rule 29 or Rule 33 on this ground. See

### B. The Evidence Was Sufficient to Convict McKen for Sex Trafficking (Counts III & V)

McKen's second argument for acquittal or a new trial is that the evidence was insufficient to convict him on Counts Three and Five of the Indictment, which charged him with Sex Trafficking in violation of 18 U.S.C. § 1591(a)(1) as to Amanda and Ella, respectively. (Def's Br. at 10-14.) These charges require proof beyond a reasonable doubt that McKen (among other things) knew or was reckless to the fact that force, threats of force, fraud, or coercion were used to cause Amanda and Ella to engage in a commercial sex act. See 18 U.S.C. § 1591(a)(1). The thrust of McKen's argument against the sufficiency of the evidence on these charges is that "the

16

complainants were not truly coerced into working in the sex trade, and that they did so for financial and other motives rather than because Mr. McKen forced them." (Def's Br. at 13.)

As this Court has explained, "[a] defendant's behavior is coercive when it fits within the definition of § 1591(e)(2)[3] and is 'sufficiently serious to cause both the victim and reasonable people of the same background and in the same circumstances to feel coerced.'" United States v. Frey, 736 F. Supp. 3d 128, 139 n.7 (E.D.N.Y. 2024) (quoting United States v. Purcell, 967 F.3d 159, 192 (2d Cir. 2020). For the following reasons, viewing the evidence in the light most favorable to the Government, there was sufficient evidence for the jury to find that McKen coerced Amanda and Ella. The Court therefore upholds his convictions on Counts III and V.

**1. Amanda**

With respect to Amanda, McKen asserts that the evidence is insufficient to establish coercion "because withholding drugs (alone) is not coercion." (Def's Br. at 12) (citing Purcell, 967 F.3d 159 at 193-94.) According to McKen, "the friction" between him and Amanda

> was more about managing her addiction in the context of their venture than any true effort by Mr. McKen to use Amanda's addiction to coerce her role in the venture, a venture which she otherwise commenced on consent prior to Mr. McKen having any knowledge of, or the extent of, her drug addiction.

(Def's Br. at 13.)

The Court finds that there was sufficient evidence that McKen coerced Amanda into engaging in commercial sex. In evaluating the sufficiency of the evidence here, the Court "must consider the evidence presented in its totality, not in isolation." United States v. Anderson, 747

---

[3] 18 U.S.C. § 1591(e)(2) defines "coercion" as: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process. 18 U.S.C. § 1591(e)(2).

17

F.3d 51, 59 (2d Cir. 2014) (internal quotations and citation omitted.)  Again, the Court must also "view the evidence in the light most favorable to the government, draw[] all inferences in the government's favor and defer[]to the jury's assessments of the witnesses' credibility."  United States v. Pierce, 785 F.3d 832, 837–38 (2d Cir. 2015).

McKen's suggestion that his withholding drugs was not coercive, and that Amanda was "free to leave all along" (Def's Br. at 13,) blinks at the totality of the evidence presented at trial.  McKen not only withheld drugs from Amanda, leading to "very painful . . . agonizing" withdrawals, he also controlled all the money Amanda made, and even determined when and what she ate.  (See Tr. 620, 617-18.)  Additionally, Amanda testified that McKen had sex with her even though she "did not want to," and that she performed sex acts she was uncomfortable with because McKen demanded it.  (Tr. 610); (see Tr. 615) ("I never had anal sex before, but I was told that somebody wanted anal sex for a certain amount of money. So I had to do it.")  Contrary to McKen's restrictive view of the evidence, Amanda's testimony made clear that due to McKen's acts, she had "no other choice" but to continue working for him.  (Tr. 631); (see also Tr. 618) ("I wasn't choosing to do what I was doing."); (Tr. 608) ("I had no idea what was going on except for I now had no ID. I didn't have my money. I'm in withdrawals and I have no idea what's about to happen.")

Taken as a whole, the evidence at trial establishes that a rational trier of fact could have found beyond a reasonable doubt that McKen coerced Amanda into engaging in commercial sex acts.  See Pierce, 785 F.3d at 838 ("We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original) (internal quotations omitted).  There was sufficient evidence at trial that McKen threatened and exploited Amanda's drug addiction and financial situation to coerce her into prostitution.  See United States v. Shine, No. 20-314, 2022 WL 761520, at *2 (2d Cir. Mar. 14,

18

2022) (rejecting Defendant's insufficiency argument because Defendant "exploited victims' fear of homelessness, withdrawal, and violence to compel them to engage in commercial sex acts when they otherwise would not have done so.")  Thus, the Court rejects McKen's argument that the evidence was insufficient to convict on Count III.

   2. **Ella**

With respect to Ella, McKen largely recapitulates his argument against his conviction regarding Amanda.  He again states that Ella was free to leave McKen at any time, casting doubt on her purported coercion.  (Def's Br. at 14.) ("Objectively, Ella's departure without consequences demonstrates that her acquiescence was not forced or coerced, or at the very least, casts reasonable doubt upon whether her acquiescence was required.")  The Court rejects this argument as well.

The record is replete with evidence that McKen coerced Ella into performing commercial sex acts.  She testified at numerous points that McKen frequently used physical violence to prevent her from going "out of pocket."  (See, e.g., Tr. 135 ("I remember the time that I had an abortion and he choked me. I remember the time that he choked me to where I blacked out and a handful more."); Tr. 133 ("I remember building a bed when we first moved in here, and Cavalli got mad when we were building the bed and ended up hitting me."); Tr. 134 ("Whether it was hitting me in my face, choking me, slamming me to the ground, it was consistent throughout the two years that I was with him."))  McKen also threatened Ella with guns on multiple occasions.  (See, e.g., Tr. 136 ("Cavalli had held a gun to my head in this kitchen."); Tr. 168 ("Cavalli had walked out of the house with a gun and I – I went inside with him and he pointed this gun at me and we kind of wrestled around for a little bit.")  Additionally, McKen controlled Ella's finances and exploited this situation to maintain control over her.  (See, e.g., Tr. 204 ("I agree the first year I did have a better lifestyle, but towards the end I was sleeping in my car to make rent. I didn't get to partake

19

in the lavish lifestyle. He got to stay in that house while I was out working."); Tr. 173 ("Cavalli immediately stopped paying all -- any bills towards this home and I ended up getting an eviction from this home.") This evidence is more than sufficient for a rational jury to find that Ella was coerced.

Finally, while McKen is correct that Ella left and returned on multiple occasions, the jury heard this testimony and was free to consider it in its deliberations. The jury was also free to consider that Ella had been a prostitute prior to meeting McKen and continued to engage in sex work "for financial and other motives." (Def's Br. at 14.) Both arguments, however, aim at the credibility of the victims' testimony – not at the sufficiency of the evidence. And the Court must "defer[] to the jury's assessments of the witnesses' credibility." Shine, 2022 WL 761520, at *1 (internal quotations and citation omitted); see also United States v. Rivera, 799 F.3d 180, 186 (2d Cir. 2015) ("That some of the victims may have been prostitutes before working at the bars does not suggest that Appellants did not later threaten them with violence or deportation in order to coerce them into commercial sex.") Thus, the Court finds that the evidence was sufficient to convict McKen on Count V.

### IV. CONCLUSION

For the reasons stated above, McKen's motion for acquittal or a new trial is DENIED. The Court declines to grant McKen relief from his convictions.

**SO ORDERED.**
Dated: May 13, 2025
Central Islip, New York

                                                (/s/ JMA)
                                        JOAN M. AZRACK
                                        UNITED STATES DISTRICT JUDGE